No. 14-1902

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

| | | |
|---|---|---|
| ASHOOR RASHO, #B38970, | ) | Appeal from the United States |
| | ) | District Court for the Central |
| Plaintiff-Appellant, | ) | District of Illinois, Peoria |
| | ) | Division |
| v. | ) | |
| | ) | |
| DR. WILLARD O. ELYEA, Doctor, | ) | |
| WENDY NAVARRO (now known | ) | No. 1:11-cv-01308-MMM-JEH |
| as Wendy Blank), EDDIE JONES, | ) | |
| JOHN GARLICK, and MICHAEL | ) | |
| F. MASSA, | ) | The Honorable |
| | ) | MICHAEL M. MIHM, |
| Defendants-Appellees. | ) | Judge Presiding. |

**STATE DEFENDANTS-APPELLEES'
PETITION FOR PANEL REHEARING**

**LISA MADIGAN**
Attorney General
State of Illinois

**DAVID L. FRANKLIN**
Solicitor General

100 West Randolph Street
12th Floor
Chicago, Illinois 60601
(312) 814-3312

**EVAN SIEGEL**
Assistant Attorney General
100 West Randolph Street
12th Floor
Chicago, Illinois 60601
(312) 814-2568
esiegel@atg.state.il.us

Attorneys for State
Defendants-Appellees

## TABLE OF CONTENTS

**Page(s)**

SUGGESTION FOR PANEL REHEARING……………………………………………1

ARGUMENT………………………………………………………………...…………..2

i

## TABLE OF AUTHORITIES

**Cases**                                                           **Page(s)**

*Easley v. Reuss*,
    532 F.3d 592 (7th Cir. 2008) ............................................................................................... 2

*Rasho v. Elyea*,
    850 F.3d 318 (7th Cir. 2017) .................................................................................... 1, 3

## **Other Authorities**

Fed. R. App. P. 40 ............................................................................................................... 2

Seventh Cir. Rule 40 ........................................................................................................... 2

**SUGGESTION FOR PANEL REHEARING**

This Court should grant rehearing by the panel to correct a factual error in the Court's decision of March 7, 2017. (A1-10).[1] In that decision, the Court held that Dr. John Garlick, one of the State Defendants-Appellees, "provided mental health services to Pontiac inmates pursuant to the IDOC's contract with private contractor Wexford Health Sources, Inc." *Rasho v. Elyea*, 850 F.3d 318, 322 (7th Cir. 2017) (A5). But Dr. Garlick was not a private contractor. Instead, he was a state employee who worked for the Illinois Department of Corrections. (A12 (R. 457)). The Court's error merits correction because it eliminates the affirmative defense of qualified immunity for Dr. Garlick on remand. *See Rasho*, 850 F.3d at 328 (A9) (holding that Dr. Garlick "cannot assert qualified immunity as a defense to Rasho's claims"); *id.* (reversing grant of summary judgment to Dr. Garlick and remanding for further proceedings).

---

[1]      "A_" refers to the appendix to this petition.

# ARGUMENT

## The panel overlooked or misapprehended Dr. Garlick's employment by the Illinois Department of Corrections.

This Court should grant the petition for panel rehearing because the decision incorrectly stated that Dr. Garlick was an employee of Wexford, a private company. The record on appeal and docket, however, showed that he was in fact a state employee who worked for the Department. A panel rehearing therefore is warranted under Federal Rule of Appellate Procedure 40, which provides that remedy when a decision "has overlooked or misapprehended" a point of law or fact. Fed. R. App. P. 40; *see also* Seventh Cir. Rule 40; *Easley v. Reuss*, 532 F.3d 592, 593 (7th Cir. 2008) ("petitions for panel rehearing should alert the panel to specific factual . . . matters that the party raised, but that the panel may have failed to address or may have misunderstood").

The record showed that Dr. Garlick, the psychology services administrator at Pontiac Correctional Center since May 2004 (R. 452), was a state employee who worked for the Department (A12 (R. 457)). When asked at his deposition if he was employed by the State of Illinois, Dr. Garlick answered, "That's correct." (*Id.*). He also discussed lawsuits that inmates of the Department filed against him, all during his tenure as a state employee. (*See* R. 455-56). And in discussing boards and committees that he serves on at Pontiac, Dr. Garlick explained that no employees of Wexford also serve on those boards and committees, distinguishing his own service as

a state employee from that of colleagues (including Defendant-Appellee Dr. Michael Massa)[1] who were employed by Wexford. (R. 483).

In addition, the district court docket and the docket in this Court accurately reflect that Dr. Garlick was a state employee. The Office of the Illinois Attorney General, which does not represent private litigants, appeared on behalf of Dr. Garlick in both the district court and this Court. In the district court, the Attorney General filed on Dr. Garlick's behalf an answer to Rasho's complaint and raised the affirmative defense of qualified immunity. (R. 68, 74). Later, the Attorney General filed Dr. Garlick's (and the other State Defendants-Appellees') motion for summary judgment. (R. 171). In this Court, the Attorney General appeared on behalf of Dr. Garlick (App. Doc. 27) and filed a brief on behalf of him and his co-Defendants-Appellees, all of them state employees (App. Doc. 38). Nothing in the record suggests that Dr. Garlick was a Wexford employee during the pendency of this case.

Because Dr. Garlick was an employee of the State and not, as this Court stated, an individual working for a "private contractor," *Rasho*, 850 F.3d at 322 (A5), the Court's decision should be replaced with an opinion that (1) removes the reference to Dr. Garlick as a Wexford employee, *id.*, and (2) clarifies that, as a state employee, he was entitled to raise qualified immunity, *id.* at 327-28 (A9-10).

---

[1]     Dr. Massa was represented in the district court and in this Court by private attorneys retained by Wexford, his employer. (*See, e.g.*, Docs. 7, 61-62; App. Docs. 2, 39).

## CONCLUSION

For the foregoing reasons, State Defendants-Appellees Willard O. Elyea,

Wendy Navarro, Eddie Jones, and John Garlick request that this Court grant the

petition for panel rehearing.

April 19, 2017                                           Respectfully submitted,

                                                        **LISA MADIGAN**
                                                        Attorney General
                                                        State of Illinois

                                                        **DAVID L. FRANKIN**
                                                        Solicitor General

                                                        100 West Randolph Street
                                                        12th Floor
                                                        Chicago, Illinois 60601
                                                        (312) 814-3312

                                                        Attorneys for State
/s/ Evan Siegel                                         Defendants-Appellees
**EVAN SIEGEL**
Assistant Attorney General
100 West Randolph Street
12th Floor
Chicago, Illinois 60601
(312) 814-2568
esiegel@atg.state.il.us

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, and TYPE STYLE REQUIREMENTS**

I hereby certify that this petition complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and Circuit Rule 32 and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this petition has been prepared in proportionally spaced typeface using Microsoft Word 2013, in 12-point Century Schoolbook BT font, and complies with Federal Rule of Appellate Procedure 35(b)(2)(A), in that the petition contains 698 words.

/s/Evan Siegel
**EVAN SIEGEL**
Assistant Attorney General
100 West Randolph Street
12th Floor
Chicago, Illinois 60601
(312) 814-2568
esiegel@atg.state.il.us

**APPENDIX**

## TABLE OF CONTENTS TO THE APPENDIX

*Rasho v. Elyea*,
   850 F.3d 318 (7th Cir. 2017)…………………………........................A1-10

Excerpt of deposition of Dr. John Garlick
   (Doc. 62-2 at 1, 48) (R. 410, 457) (June 26, 2012) …………….......A11-12

850 F.3d 318
United States Court of Appeals,
Seventh Circuit.

Ashoor RASHO, Plaintiff–Appellant,

v.

Willard O. ELYEA, et al., Defendants–Appellees.

No. 14-1902
|
Argued April 17, 2015
|
Decided March 7, 2017

**Synopsis**
**Background:** Inmate at state prison brought §
1983 action against prison warden and four
members of prison medical staff, alleging that
defendants acted with deliberate indifference to
inmate's serious medical needs in violation of
Eighth Amendment when they transferred him out
of prison's mental health unit. The United States
District Court for the Central District of Illinois,
No. 1:11-CV–01308, Michael M. Mihm, J., 2014
WL 1281997, granted defendants' motion for
summary judgment. Inmate appealed.


**Holdings:** The Court of Appeals, Wood, District
Judge, sitting by designation, held that:

[1] genuine issue of material fact existed as to
whether two members of prison medical staff acted
with deliberate indifference when they transferred
inmate out of mental health unit;

[2] genuine issue of material fact existed as to
whether inmate suffered physical injury resulting
from his transfer out of prison's mental health
unit;

[3] there was no evidence that warden and two
supervisory members of prison medical staff were
personally responsible for decision to transfer
inmate out of prison's mental health unit or were
otherwise connected to allegedly deficient mental
health care he received after that transfer; and

[4] staff members were employees of private
contractor, and therefore could not assert qualified
immunity.

Affirmed in part, reversed in part, and remanded.


West Headnotes (13)

[1]     **Federal Courts**
        ← Summary judgment
        **Federal Courts**
        ← Summary judgment

        The Court of Appeals reviews a district
        court's grant of summary judgment de
        novo, viewing the record in the light most
        favorable to the nonmoving party and
        drawing all inferences in his favor.

        Cases that cite this headnote


[2]     **Sentencing and Punishment**
        ← Medical care and treatment

        Prison officials and medical staff violate
        the Eighth Amendment's prohibition on
        cruel and unusual punishment when they
        act with deliberate indifference to a
        prisoner's serious medical needs. U.S.
        Const. Amend. 8.

        4 Cases that cite this headnote


[3]     **Sentencing and Punishment**
        ← Medical care and treatment

        To determine if the Eighth Amendment
        has been violated in the prison medical
        context, the Court of Appeals performs a

**A1**

two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual was deliberately indifferent to that condition. U.S. Const. Amend. 8.

1 Cases that cite this headnote

[4]    **Sentencing and Punishment**
    Deliberate indifference in general

Deliberate indifference under the Eighth Amendment requires that a defendant actually know about yet disregard a substantial risk of harm to an inmate's health or safety. U.S. Const. Amend. 8.

Cases that cite this headnote

[5]    **Sentencing and Punishment**
    Medical care and treatment

The standard for deliberate indifference under the Eighth Amendment in the prison medical context is a subjective one, in which the defendant must know facts from which he could infer that a substantial risk of serious harm exists and he must actually draw the inference. U.S. Const. Amend. 8.

1 Cases that cite this headnote

[6]    **Sentencing and Punishment**
    Medical care and treatment

A prison medical professional acting in his professional capacity may be held to have displayed deliberate indifference under the Eighth Amendment only if the decision by

the professional is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment. U.S. Const. Amend. 8.

Cases that cite this headnote

[7]    **Federal Civil Procedure**
    Civil rights cases in general

Genuine issue of material fact existed as to whether two members of prison medical staff acted with deliberate indifference when they transferred inmate out of mental health unit, precluding summary judgment on inmate's Eighth Amendment claim brought pursuant to § 1983 against staff members. U.S. Const. Amend. 8; 42 U.S.C.A. § 1983.

Cases that cite this headnote

[8]    **Federal Civil Procedure**
    Civil rights cases in general

Genuine issue of material fact existed as to whether inmate suffered physical injury resulting from his transfer out of prison's mental health unit, such that his claim would not be barred under Prison Litigation Reform Act (PLRA), precluding summary judgment on inmate's Eighth Amendment deliberate indifference claim brought against two members of prison medical staff pursuant to § 1983. U.S. Const. Amend. 8; 42 U.S.C.A. § 1983; Civil Rights of Institutionalized Persons Act § 7, 42 U.S.C.A. § 1997e(e).

Cases that cite this headnote

**A2**

[9] **Civil Rights**
🔑Criminal law enforcement;  prisons

In order to hold an individual defendant liable under § 1983 for a violation of an inmate's constitutional rights, the inmate must show that the defendant was personally responsible for that violation; a defendant will be deemed to have sufficient personal responsibility if he directed the conduct causing the constitutional violation, or if it occurred with his knowledge or consent. 42 U.S.C.A. § 1983.

Cases that cite this headnote

[10] **Civil Rights**
🔑Vicarious liability and respondeat superior in general;  supervisory liability in general

While the defendant need not have participated directly in the deprivation of the plaintiff's constitutional right to be held liable under § 1983, he or she must nonetheless have known about the conduct, facilitated it, approved it, condoned it, or turned a blind eye for fear of what they might see. 42 U.S.C.A. § 1983.

Cases that cite this headnote

[11] **Prisons**
🔑Psychological conditions and treatment
**Sentencing and Punishment**
🔑Psychological and psychiatric treatment

There was no evidence that prison warden and two supervisory members of prison medical staff were personally responsible for decision to transfer inmate out of prison's mental health unit or were otherwise connected to allegedly deficient mental health care he received after that transfer, as required to support inmate's § 1983 claim alleging deliberate indifference in violation of Eighth Amendment. U.S. Const. Amend. 8; 42 U.S.C.A. § 1983.

Cases that cite this headnote

[12] **Prisons**
🔑Health and Medical Care

Prison officials generally are entitled to rely on the judgment of medical professionals treating an inmate.

Cases that cite this headnote

[13] **Civil Rights**
🔑Privilege or Immunity;  Good Faith and Probable Cause

Two medical professionals at prison were employees of private contractor, and therefore could not assert qualified immunity as defense to inmate's deliberate indifference claim under Eighth Amendment. U.S. Const. Amend. 8.

1 Cases that cite this headnote

**\*320** Appeal from the United States District Court for the Central District of Illinois. No. 1:11–CV–01308—**Michael M. Mihm**, *Judge*.

**Attorneys and Law Firms**

Lee N. Abrams, Marc R. Kadish, Attorneys, Mayer Brown LLP, Chicago, IL, Daniel Edward Jones, Attorney, Mayer Brown LLP, Washington, DC, for

Rasho v. Elyea, 850 F.3d 318 (2017)

Plaintiff–Appellant.

Evan Siegel, Attorney, Office of the Attorney General, Chicago, IL, for Willard O. Elyea, Wendy Navarro, Eddie Jones, and John Garlick.

Natalie D. Thompson, Craig L. Unrath, Attorneys, Heyl, Royster, Voelker & Allen, Peoria, IL, for Michael F. Massa.
Before Posner and Williams, Circuit Judges, and Wood, District Judge.[*]

**Opinion**

Wood, District Judge.

Ashoor Rasho arrived at the Pontiac Correctional Center ("Pontiac"), an Illinois prison, in 2003. Rasho has a history of mental illness and, after he stopped taking his medication and began showing escalating symptoms, he was transferred into Pontiac's Mental Health Unit. He remained in the Mental Health Unit until 2006, when he was transferred to the North Segregation Unit. Rasho believes that he was transferred out of the Mental Health Unit not because he no longer required **\*321** the specialized treatment offered there but instead in retaliation for complaints he had lodged against various prison staff. According to Rasho, after he was transferred, he was denied even minimally adequate mental health care for more than 20 months.

Rasho subsequently filed a lawsuit pursuant to 42 U.S.C. § 1983 against the Pontiac staff psychiatrist and psychology services administrator who recommended his transfer out of the Mental Health Unit, as well as the warden, medical director, and director of mental health, alleging that each acted with deliberate indifference to his serious medical needs in violation of the Eighth Amendment to the United States Constitution.[1] The district court granted summary judgment in favor of all of the defendants. Rasho now appeals.

**I.**

Rasho has been an inmate in the custody of the Illinois Department of Corrections ("IDOC") since 1996, although he did not arrive at Pontiac until 2003. He has a history of mental illness—characterized by auditory hallucinations, severe depression, agitation, self-mutilation, and suicide attempts—for which he has been prescribed psychotropic medications. At various times, he has been diagnosed with the Axis I mental disorders "Major Depressive Disorder, Recurrent, with Psychotic Features or Schizophrenia" and "Major Depressive Disorder with Psychotic Features, Recurrent."[2] While at Pontiac, he also received an Axis I diagnosis of "history of polysubstance abuse and dependence" and an Axis II diagnosis of "antisocial personality disorder and borderline personality disorder." As described by his expert witness in this case, Rasho is a "very, very sick man."

In April 2004, after Rasho stopped taking his medications and began cutting himself, a psychiatrist at Pontiac recommended that he be transferred to the prison's Mental Health Unit. Inmates assigned to that unit have more frequent access to mental health professionals and receive greater continuity of mental health care than those in other prison units. Among the therapeutic benefits available to inmates in the Mental Health Unit are group therapy, cells with open bars, and the ability to have private and confidential conversations with mental health staff more easily. Inmates in the Mental Health Unit also may receive individual therapy, crisis intervention, and psychotropic medication management.

While Rasho was in the Mental Health Unit, he met with mental health professionals at least monthly and was prescribed psychotropic medications. Yet the record reveals that Rasho still cut himself on approximately five or six occasions—including at least twice that resulted in Rasho being placed on crisis watch—and engaged in other disruptive and self-destructive behavior. He complained frequently and acted out while in the Mental Health Unit and filed several grievances regarding Pontiac staff.

**\*322** Rasho remained in the Mental Health Unit until he was transferred to the North Segregation Unit in November 2006. The transfer was initially recommended by Dr. Michael Massa, who worked as a staff psychiatrist at Pontiac and treated

**A4**

Rasho. The transfer was also approved by Dr. John Garlick, who held the position of Psychology Services Administrator and was Dr. Massa's supervisor. At the time, Dr. Massa and Dr. Garlick provided mental health services to Pontiac inmates pursuant to the IDOC's contract with private contractor Wexford Health Sources, Inc. ("Wexford"). Dr. Massa first recommended that Rasho be transferred out of the Mental Health Unit on May 25, 2006; he followed with another recommendation on August 3, 2006. Rasho was eventually transferred in November 2006.

The parties dispute the reason for Dr. Massa's and Dr. Garlick's determination to transfer Rasho out of the Mental Health Unit. Dr. Massa claims that he recommended the transfer because he did not believe that Rasho had a diagnosis or set of symptoms such that he was benefitting from the placement. Dr. Massa also claims that he had become concerned that Rasho's continued presence in the Mental Health Unit would be detrimental to other inmates in the unit—specifically, Rasho was showing signs of antisocial personality disorder that made him a risk to the genuinely mentally ill and vulnerable inmates there. Dr. Garlick claims that he agreed that Rasho should leave the Mental Health Unit based on his own interactions with Rasho and his knowledge of Rasho's condition and behavior. According to Dr. Garlick, he too was concerned that Rasho's continued presence in the Mental Health Unit would have a detrimental effect on other inmates and he also doubted that Rasho was benefitting from placement there.

Rasho challenges Dr. Massa's and Dr. Garlick's stated reasons for recommending his transfer out of the Mental Health Unit. He contends that they actually decided to have him transferred as punishment for his complaints. In fact, Rasho claims that both Dr. Massa and Dr. Garlick actually told him that he was kicked out of the Mental Health Unit because he filed too many grievances. Rasho also points out that Dr. Massa recommended the transfer even though Dr. Massa was well aware of Rasho's history of mental health problems and continued to prescribe Rasho powerful psychotropic medications after making the recommendation. One of those medications was Geodon, which is primarily used to treat schizophrenia and mania and to provide maintenance for bipolar disorder. If Dr. Massa

truly believed that he did not require specialized mental health treatment, Rasho argues, then why would he continue to prescribe medications indicated only for that purpose?

Rasho also has presented testimony from Dr. Jose Matthews, who treated Rasho in the North Segregation Unit, and Dr. Joel Silverberg, an expert witness retained on Rasho's behalf for purposes of this case. Dr. Matthews testified that after treating Rasho for some time in the North Segregation Unit (and initially believing that Rasho might be malingering), he came to believe that Rasho did require greater care than would be provided in the North Segregation Unit and should be transferred back to the Mental Health Unit. When Dr. Matthews raised the issue, however, Dr. Garlick rejected the idea stating "no, no, no, [Rasho] can't go there."

Similarly, Dr. Silverberg has offered an expert opinion that Rasho should have been kept in the Mental Health Unit and not transferred to the North Segregation Unit, an environment that he considers to have been "toxic" to Rasho's mental health **\*323** and where there was no meaningful mental health treatment. According to Dr. Silverberg, inmates in the North Segregation Unit were isolated and treated like animals. Moreover, the filth and noise there aggravated Rasho's condition and, because the unit did not have places that allowed Rasho to talk to mental health staff in private, Rasho was forced to downplay his issues. Dr. Silverberg concluded that Rasho was undertreated while at Pontiac but did respond when provided with appropriate care—*i.e.*, beginning no earlier than 2008 (or approximately 20 months after Rasho was transferred), when Dr. Matthews arrived at Pontiac and began paying special attention to Rasho beyond what would otherwise have been provided.

Although it is undisputed that Rasho cut himself both while he was in the Mental Health Unit and after he was transferred, supported by the testimony from Dr. Matthews and Dr. Silverberg, Rasho claims that his mental health deteriorated and his self-mutilation escalated after he was transferred.

Rasho was transferred from Pontiac to Stateville Correctional Center in 2011, but then returned to

**A5**

Pontiac's North Segregation Unit in February 2012. Rasho claims that his mental health treatment upon his return to Pontiac was very different than during his prior stint there. The difference was the attention he received from Dr. Matthews, who began meeting with Rasho for two hours each week. Rasho characterizes the treatment that Dr. Matthews provided him as exceptional and not at all typical of the care usually provided to inmates in the North Segregation Unit. Dr. Matthews has acknowledged that he initially felt that Rasho might be faking his symptoms. By the time he left Pontiac in September 2012, however, Dr. Matthews had changed his mind and recommended that Rasho be transferred to the Mental Health Unit. As noted above, this recommendation was rejected by Dr. Garlick.

Rasho claims in his lawsuit that Dr. Massa and Dr. Garlick acted with deliberate indifference to his serious medical needs by transferring him out of the Mental Health Unit. Rasho also has sued three supervisory IDOC staff for their purported deliberate indifference: Dr. Wendy Blank (originally named in Rasho's lawsuit under her prior name, Wendy Navarro) served as IDOC's Director of Mental Health beginning in 2006; Dr. Willard Elyea served as IDOC's medical director from 1999 until April 2007; and finally, Eddie Jones was Pontiac's warden from 2006 to 2008. Rasho seeks to hold these defendants liable under a theory that they failed in their respective duties to take reasonable steps to ensure adequate medical care for seriously mentally ill inmates.

The district court granted summary judgment in favor of all of the defendants. Focusing on his claim against Dr. Massa, the district court found that Rasho could not show that he actually received inadequate care while in the North Segregation Unit. Key to the district court's conclusion was the opinion from Dr. Silverberg that the care provided to Rasho by Dr. Matthews fell within the appropriate standard of care. As the district court explained, "the importance of [Dr. Silverberg's] testimony is the fact that Rasho was capable of getting 'appropriate and reasonable' treatment while being housed in North Segregation unit. Given this, it is difficult to find that Dr. Massa's recommendation to transfer Rasho to North Segregation would violate the

Constitution." The district court went on to express skepticism that Rasho would be able to establish any injury as a result of the alleged constitutional violation, since he self-mutilated both before and after the transfer.

**\*324** Having concluded that Rasho could not prevail against the medical provider most directly responsible for the decision to transfer him out of the Mental Health Unit, the district court next considered Rasho's claims against Dr. Garlick, Dr. Elyea, Dr. Blank, and Warden Jones. With respect to Dr. Garlick, the district court found that he was even further removed from the transfer decision than Dr. Massa and, in any case, that there was no evidence he knew a transfer from the Mental Health Unit would be detrimental to Rasho's mental health. With respect to Dr. Elyea and Dr. Navarro, who were even further removed from the transfer decision than Dr. Garlick, the district court concluded that there was no evidence their actions caused any harm to Rasho in particular. Finally, the district court held that the record could not support a finding that Warden Jones failed to comply with any duty by not preventing Rasho from being transferred out of the Mental Health Unit into the allegedly terrible conditions of the North Segregation Unit.

## II.

[1]We review the district court's grant of summary judgment *de novo*, viewing the record in the light most favorable to Rasho and drawing all inferences in his favor. *Petties v. Carter*, 836 F.3d 722, 727 (7th Cir. 2016). Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

[2] [3]It is well-established that prison officials and medical staff violate the Eight Amendment's prohibition on cruel and unusual punishment when they act with deliberate indifference to a prisoner's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976); *Chatham v. Davis*, 839 F.3d 679, 684 (7th Cir. 2016). "To determine if the Eighth Amendment has been violated in the prison

**A6**

medical context, we perform a two-step analysis, first examining whether a plaintiff suffered from an objectively serious medical condition, and then determining whether the individual was deliberately indifferent to that condition." *Petties*, 836 F.3d at 727–28 (citing *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010)).

For purposes of summary judgment, the defendants conceded below that whether Rasho suffered from an objectively serious medical condition constitutes a triable issue of fact for a jury to decide. And so the question to be determined here is whether Rasho has produced sufficient evidence to permit a jury to find that any of the defendants were deliberately indifferent to his condition.

[4] [5] [6]Deliberate indifference requires that a defendant actually know about yet disregard a substantial risk of harm to an inmate's health or safety. *Petties*, 836 F.3d at 728. "The standard is a subjective one: The defendant must know facts from which he could infer that a substantial risk of serious harm exists and he must actually draw the inference." *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016). Emphasizing the deference owed to the professional judgment of medical providers, we have observed that "[b]y definition a treatment decision [that is] based on professional judgment cannot evince deliberate indifference because professional judgment implies a choice of what the defendant believed to be the best course of treatment." *Id.* at 805; *see also McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2013); *Sain v. Wood*, 512 F.3d 886, 894–95 (7th Cir. 2008). "A medical professional acting in his professional capacity may be held to have displayed deliberate indifference only if **\*325** the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Sain*, 512 F.3d at 895 (internal quotation marks omitted).

The defendants would like us to view the decision to transfer Rasho out of the Mental Health Unit as an exercise of medical judgment entitled to judicial deference. But Rasho claims that Dr. Masso and

Dr. Garlick did not exercise medical judgment *at all* in deciding to recommend that he be transferred. Instead, Rasho contends, their decision was motivated by spite: they sought to have him transferred in retaliation for his several grievances against prison staff and medical personnel.

In *Petties*, we recognized that the choice of "an easier and less efficacious treatment without exercising professional judgment" can constitute deliberate indifference. 836 F.3d at 730 (internal quotation marks omitted). Most often, this concern arises when a medical provider is alleged to have chosen a treatment—or lack thereof—based on cost considerations rather than medical judgment. *See, e.g.*, *Roe v. Elyea*, 631 F.3d 843, 863 (7th Cir. 2011) ("Although administrative convenience and costs may be, in appropriate circumstances, permissible factors for correctional systems to consider in making treatment decisions, the Constitution is violated when they are considered to the exclusion of reasonable medical judgment about inmate health." (emphasis omitted)); *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006) ("The cost of treatment alternatives is a factor in determining what constitutes adequate, minimum-level medical care, but medical personnel cannot simply resort to an easier course of treatment that they know is ineffective." (citations omitted)). But a similar concern arises if a medical provider bases his or her treatment decision on personal prejudices or animosity. In either circumstance, the medical provider may violate the patient-inmate's constitutional rights by failing to exercise medical judgment at all. *See Roe*, 631 F.3d at 863.

[7]Rasho here has put forward sufficient evidence from which a reasonable jury could decide that Dr. Massa and Dr. Garlick caused him to be transferred out of the Mental Health Unit for reasons that had nothing to do with medical judgment. Such evidence includes Rasho's own testimony that Dr. Massa and Dr. Garlick each explicitly told him that he was transferred in response to his complaints. The district court discounted Rasho's testimony on this point as not sufficiently unequivocal in its language. But Rasho's credibility and the weight to be afforded his testimony is a matter for a jury to decide. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255,

106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[.]"). Together with his mental health history, the continued prescription of psychotropic medications after his transfer, the testimony from Dr. Matthews regarding his need for mental health treatment and Dr. Garlick's refusal to allow him to return to the Mental Health Unit, and Dr. Silverberg's expert testimony, Rasho's testimony is sufficient to create a disputed issue of material fact regarding whether Dr. Massa and Dr. Garlick recommended the transfer as retaliation rather than as a matter of legitimate judgment.

Furthermore, we reject the suggestion that a reasonable jury could not find that Dr. Massa and Dr. Garlick acted in retaliation for Rasho's grievances simply because those grievances were directed toward other **326 Pontiac staff members. To the contrary, a reasonable inference to be drawn from the evidence could be that Dr. Massa and Dr. Garlick were motivated either to punish Rasho for his complaints against their colleagues or by a desire to remove a troublemaking inmate before they became the next targets of his complaints.

In addition, drawing all reasonable inferences from the evidence in Rasho's favor, a jury could conclude that Rasho was harmed as a result of his transfer out of the Mental Health Unit. The district court expressed skepticism that such a causal connection could be proved. But a jury could agree with Dr. Silverberg that being transferred out of the Mental Health Unit increased the risk that Rasho's mental condition would deteriorate, leading to self-mutilation and other self-destructive behavior. That Rasho was capable of getting appropriate and reasonable treatment while in the North Segregation Unit is not dispositive where a jury could find that to have been the case only due to an extraordinary effort by Dr. Matthews.

[8]As an alternative basis for its grant of summary judgment in favor of Dr. Massa, the district court concluded that Rasho's claim is barred by the Prison Litigation Reform Act, 42 U.S.C. § 1997e(e), because he cannot present evidence of a physical injury. Section 1997e(e) provides that "[n]o Federal civil action may be brought by a prisoner

confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury or the commission of a sexual act." 42 U.S.C. § 1997e(e). The district court found that Rasho could not present evidence of a physical injury resulting from his transfer out of the Mental Health Unit and therefore his claim is barred. But Rasho did present evidence of at least one undisputed incident of self-mutilation. That incident is sufficient to satisfy the physical harm requirement. And as discussed above, Rasho has demonstrated that there is a triable issue of fact regarding whether that harm is attributable to the increased risk to his mental health resulting from his transfer.

Even if Rasho were unable to point to any physical injury, the lack of such an injury would not bar his claim but rather merely limit the damages he could recover: if Rasho proved his claim, he would still be able to recover nominal and punitive damages. Gray v. Hardy, 826 F.3d 1000, 1007 (7th Cir. 2016); Calhoun v. DeTella, 319 F.3d 936, 941–42 (7th Cir. 2003). Thus the district court erred in suggesting that the lack of a physical injury provided an independent basis to grant summary judgment in Dr. Massa's favor.

### III.

As noted above, in addition to Dr. Massa and Dr. Garlick, Rasho also sued three defendants with more tenuous connections to his mental health treatment: Dr. Elyea, Dr. Blank, and Warden Jones. Specifically, Rasho sought to hold Dr. Elyea accountable for his alleged failure to supervise properly the contract between IDOC and its medical provider, Wexford; he asserted a claim against Dr. Blank based on the allegation that she knew the mental health staff at Pontiac was less than half as large as needed to provide adequate care for its inmates and that Wexford's psychiatrists were not working enough hours to comply with their contractual requirements; and finally, he sued Warden Jones based on the theory that, as the prison official in charge of ensuring proper implementation of the policies and procedures established by IDOC's Director of

**A8**

Mental Health, Warden Jones was ultimately responsible for the decision to transfer him from the **\*327** Mental Health Unit to the North Segregation Unit.

[9] [10]But in order to hold an individual defendant liable under § 1983 for a violation of an inmate's constitutional rights, the inmate must show that the defendant was personally responsible for that violation. *Childress v. Walker*, 787 F.3d 433, 439 (7th Cir. 2015); *Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001). "A defendant will be deemed to have sufficient personal responsibility if he directed the conduct causing the constitutional violation, or if it occurred with his knowledge or consent." *Sanville*, 266 F.3d at 740 (internal quotation marks omitted). While the defendant need not have participated directly in the deprivation of the plaintiff's constitutional right to be held liable, he or she must nonetheless have " 'know[n] about the conduct, facilitate[d] it, approve[d] it, condone[d] it, or turne[d] a blind eye for fear of what they might see.' " *Matthews v. City of East St. Louis*, 675 F.3d 703, 708 (7th Cir. 2012) (quoting *Jones v. City of Chicago*, 856 F.2d 985, 992–93 (7th Cir. 1988)).

[11]As the district court correctly concluded, Rasho has presented no evidence to show that any of Dr. Elyea, Dr. Blank, or Warden Jones was personally responsible for the decision to transfer him out of the Mental Health Unit or otherwise to connect the alleged conduct of those defendants to the deficient mental health care he claims to have received after that transfer. There is no evidence, for example, that Dr. Elyea's alleged failure to supervise properly Wexford's contract or Dr. Blank's alleged failure to promulgate protocols led to Rasho's transfer or caused him any harm. Nor is there any evidence that Warden Jones knew about, facilitated, approved, condoned, or turned a blind eye toward the psychiatric staff's purported decision to punish Rasho by transferring him out of the Mental Health Unit.

[12]Rasho also has failed to put forward any facts suggesting that Dr. Elyea, Dr. Blank, or Dr. Jones had any reason to doubt that Dr. Massa and Dr. Garlick based their recommendations on anything other than medical judgment. Prison officials generally are entitled to rely on the judgment of medical professionals treating an inmate, *see Rice*

*ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 676 (7th Cir. 2012) (noting that "jail officials ordinarily are entitled to defer to the judgment of medical professionals"); *Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011) (noting that non-medical prison officials can rely on the expertise of medical personnel and will generally be justified in believing that the prisoner is in capable hands). While Dr. Elyea and Dr. Blank were themselves medical professionals who might ordinarily be held to a different standard than a non-medical prison official, in this case Rasho seeks to hold Dr. Elyea and Dr. Blank accountable as prison administrators and policymakers, not treaters. Rasho has not presented evidence that either of them should have realized that something was amiss with Dr. Massa's and Dr. Garlick's transfer recommendation. Accordingly, the grant of summary judgment in their favor was appropriate as well.

## IV.

As the district court found that Rasho could not show that any of the defendants acted with deliberate indifference to his serious medical needs, the court did not reach the issue of qualified immunity. But in light of our determination that the district court erred in granting summary judgment on that basis as to Dr. Massa and Dr. Garlick, the qualified-immunity defense warrants some discussion.

[13] **\*328** This Court has construed the Supreme Court's holding that employees of privately-operated prisons may not assert a qualified-immunity defense also to deny that defense to employees of private corporations that contract with the state to provide medical care for prisoners. *Zaya*, 836 F.3d at 807 (citing *Richardson v. McKnight*, 521 U.S. 399, 412, 117 S.Ct. 2100, 138 L.Ed.2d 540 (1997)). Thus, Dr. Massa and Dr. Garlick, as employees of the private contractor Wexford, cannot assert qualified immunity as a defense to Rasho's claims. *See Petties*, 836 F.3d at 734 ("[Q]ualified immunity does not apply to private medical personnel in prisons.") (citing *Shields v. Ill. Dep't of Corr.*, 746 F.3d 782, 794 (7th Cir. 2014)); *see also Currie v. Chhabra*, 728 F.3d

626, 632 (7th Cir. 2013) (citing with approval the Sixth Circuit's holding in *McCullum v. Tepe,* 693 F.3d 696 (6th Cir. 2012), that "a [private] doctor providing psychiatric services to inmates at a state prison is not entitled to assert qualified immunity").

But even if a qualified-immunity defense were available to them, it would be inappropriate to award summary judgment in Dr. Massa's and Dr. Garlick's favors on that basis while such threshold factual questions as their states of mind remain disputed. *See Petties,* 836 F.3d at 734; *see also Zaya,* 836 F.3d at 807 (finding summary judgment on a qualified-immunity defense inappropriate because the plaintiff's claim turned on the defendant's mental state and "it is well established what the law requires in that regard"). If Dr. Massa and Dr. Garlick denied Rasho mental health treatment to retaliate against him for his grievances, then their conduct violates clearly-established law under the Eighth Amendment. For reasons we have discussed above, that is a question of fact for the jury to decide.

## V.

For the reasons stated above, we AFFIRM the district court's grant of summary judgment in favor of Defendants Elyea, Blank, and Jones, but REVERSE the grant of summary judgment in favor of Defendants Massa and Garlick. This case is REMANDED for further proceedings.

**All Citations**

850 F.3d 318

Footnotes

*    Hon. Andrea R. Wood of the Northern District of Illinois sitting by designation.

1    As explained in the district court's opinion, Rasho's individual action has been separated from the putative class action *Rasho, et al. v. Director Roger E. Walker, Jr., et al.,* Case No. 07–cv–1298 (C.D. Ill.). The present appeal, like the lower court ruling from which it has been taken, addresses only Rasho's individual claims.

2    "Axis I" is a classification for clinical disorders recognized in the Diagnostic and Statistical Manual of Mental Disorders (4th ed. Text Rev. 2000) ("DSM–IV"), published by the American Psychiatric Association and widely recognized as an authoritative source for information about mental conditions. "Axis II" is the DSM–IV's classification for personality disorders.

**End of Document**                    © 2017 Thomson Reuters. No claim to original U.S. Government Works.

A10

IN THE UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF ILLINOIS

PEORIA DIVISION

ASHOOR RASHO,                    )

        Plaintiff,            )

     vs.                       )  No. 11 CV 1308

DIRECTOR ROGER E. WALKER, JR.; )

DR. WILLARD ELYEA; DR. WENDY    )

NAVARRO; EDDIE JONES; DR. JOHN  )

GARLICK; and DR. MICHAEL F.     )

MASSA,                          )

        Defendants.           )

**COPY**

     The deposition of JOHN McKEAN GARLICK,

Psy.D., called for examination, taken pursuant to

the Federal Rules of Civil Procedure of the United

States District Courts pertaining to the taking of

depositions, taken before DINA G. MANCILLAS, a

Certified Shorthand Reporter within and for the

State of Illinois, CSR No. 84-3400 of said state,

at 16830 South Broadway Street, Crest Hill,

Illinois, on the 26th day of June, A.D. 2012, at

12:55 p.m.

1    unit administrator, correct?

2         **A.    Well, that -- yes, I am, but that's not**

3    **technically my title.**

4         Q.    These other titles that I've mentioned,

5    are you aware of -- are these other positions that

6    exist, to your knowledge?

7         **A.    No.**

8         Q.    And that means you're employed by the

9    State of Illinois, correct?

10        **A.    That's correct.**

11        Q.    And what are your primary

12   responsibilities as a psychology services

13   administrator at Pontiac?

14        **A.    I supervise the department, you know,**

15   **the clinicians in the department, train staff,**

16   **correctional staff.  I'm the designated leader of**

17   **the crisis intervention team.**

18        **I'm on call 24/7 for crises.  So if**

19   **somebody's suicidal or something, they're going to**

20   **call me for instructions on how to handle the**

21   **person at 2 in the morning or whatever.**

22        **I run a group.  I occasionally see**

23   **people for individual treatment.  I do**

24   **consultations and evaluations on the difficult**

☐

# CERTIFICATE OF SERVICE
### Certificate of Service When All Case Participants Are CM/ECF Participants

I hereby certify that on _____, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

s/_____

☐

# CERTIFICATE OF SERVICE
### Certificate of Service When Not All Case Participants Are CM/ECF Participants

I hereby certify that on _____, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

I further certify that some of the participants in the case are not CM/ECF users. I have **caused to be mailed to these participants t**he foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third-party commercial carrier for delivery within 3 calendar days, to the following non-CM/ECF participants:

counsel / party:                                    address:

_____        _____

_____        _____

_____        _____

_____        _____

_____        _____

_____        _____

_____        _____

_____        _____

s/_____